**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  20-CV-80001-ROSENBERG/REINHART**

CUTLASS COLLIERIES, LLC, n/k/a
VISTA ENERGY RESOURCES, LLC,

       Plaintiff/Counterdefendant,

v.

GARRETT MYRON JONES,

       Defendant/Counterclaimant.

_____/

**ORDER ON OBJECTIONS TO EXPERT TESTIMONY**

This matter comes before the Court on the parties' Notice of Remaining Issues that Require Adjudication at docket entry 173.[1]  In the Notice, the parties disagree about whether their respective experts may testify at trial and, if they do testify, on what subjects the experts may opine.  The Court has considered the Notice, the parties' expert reports, the parties' supplemental expert reports, and the deposition testimony of the experts.  For the reasons set forth below, the Court will not permit the experts to testify on certain topics.

The parties first brought their dispute regarding expert testimony to the Court's attention at docket entry 67 in a motion in limine.  In that motion, the Plaintiff moved to exclude Mr. Robert Morrison from testifying at trial as an expert on damages, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because Mr. Morrison's damages computations utilized a discount rate that did not account for risk or uncertainty (a "risk free" rate).  The Court denied the Defendant's motion to exclude Mr. Morrison, finding as follows:

---

1 In the interest of expediting a ruling on this matter, the Court sets forth a minimal amount of procedural history in this Order.

> It is true that, in some circumstances, the use of a low discount rate, such as the "risk free" discount rate used by Mr. Morrison, is inappropriate if "risk has [not] already been reflected in the forecast of future damages." *Lary v. Boston Scientific Corp*, No. 11-CV-23820, 2014 WL 7152769, at \*11 (S.D. Fla. Dec. 14, 2014).  Here, however, Mr. Morrison has an opinion why the risk-free rate would be appropriate, and his opinion centers on the conclusion that *if* the jury makes a factual finding about damages in the future, *then* the uncertainty of those damages is close to, or at, zero; Mr. Morrison's opinion is based upon his reading of caselaw. *E.g.*, DE 67-2 at 17-22.

DE at 25.  The Court suggested to the parties that they craft a mutually-agreed upon jury instruction where, consistent with Mr. Morrison's opinion, the jury accounted for the risk and uncertainty inherent in the Defendant's allegedly lost wages:

> [T]he parties should confer to see if they can reach an agreement that satisfies the Plaintiff's concerns, without requiring the wholesale exclusion of Mr. Morrison's testimony.  By way of example, the parties should consider whether Mr. Morrison could testify on discount rates in a general manner, and then, through the proper crafting of a jury instruction, leave the final determination of risk and uncertainty to the jury.

DE at 26.  The parties were unable to reach an agreement and have renewed their objections in the Notice before the Court.

This is an age discrimination case, with damages premised upon the Defendant's termination of employment.  The damages therefore consist primarily of lost salary and lost bonuses.  Because the Defendant's alleged damages extend into the future, calculating those damages in the present is challenging.  Assuming the Plaintiff is liable for age discrimination, for how long would the Defendant have been employed?  Would he have received raises or bonuses?  What about inflation, and what is the present-day value of a dollar earned in the future given the

2

possibility of inflation?  The Supreme Court addressed questions such as these in *Jones v. Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983).[2]

In *Jones*, the Supreme Court considered the question of a how a jury must convert uncertain earnings in the future to a value in the present.  The Court noted that the first step in this process is for the jury to arrive at "an estimate of what the lost stream of income would have been." *Id.* at 536.  Inherent in this determination is a resolution of such questions as whether the employee would have received raises and whether the employee would have remained employed until retirement.  *See id.* at 535-36.  After the jury determines what the lost wages would have been (a determination looking into the future), the Supreme Court discussed how lost income in the future should be converted to a verdict in the present. *Id.* at 536-37.  The Supreme Court endorsed the use of a discount rate, whereby payments in the future are discounted to a lower amount in the present. *See id.*  Mr. Morrison's expert report only addresses the second phase of a jury's determination—how to discount dollar amounts in the future—and he does not address the first question for the jury—the quantification of lost earnings in the future.  The limited scope of Mr. Morrison's expert report forms the core of the parties' dispute.

Mr. Morrison could not be clearer that he will not opine on just how the uncertainty surrounding the Defendant's lost future wages should be resolved.  At his deposition, he testified to the same on multiple occasions:

> Q: And, again, you're not assessing the riskiness of those performance bonuses in
> future years, correct?

---

2 Mr. Morrison relied upon *Jones* in the preparation of his expert report. DE 184-3 at 12 n.10.  The Court acknowledges that the holding and discussion of damages in *Jones* may well have been limited to the type of claim that was before the Supreme Court (an admiralty claim), but the Court assumes for the purposes of this Order that, as the Defendant has argued, the reasoning in *Jones* applies to the instant case.  The Court has made this assumption in the Defendant's favor so as to give the Defendant the benefit of the doubt in light of the fact that, in large part, the Court is excluding Mr. Morrison's testimony.

A. Correct.

Q. You're not accounting for things like a bad financial year at Cutlass rendering them unable to pay performance bonuses, correct?

A. Correct.

Q. You're not accounting for the risk that defendant might not perform well in a given year, correct?

A. Correct.

Q. You agree those risks exist, right?

A. Sure. Yeah, absolutely

DE 67 at 5.

Because Mr. Morrison's expert opinion does not address the uncertainty inherent in the Defendant's damages calculation, the Plaintiff argues that Mr. Morrison's testimony will not assist the jury in reaching a verdict and therefore should be excluded. *Daubert*, 509 U.S. at 590-91 (noting that expert evidence or testimony must assist the trier of fact). The Court finds that Mr. Morrison would *not* assist the jury with the difficult and uncertain task of quantifying the Defendant's damages in the future—the first question for the jury. The Court also finds that Mr. Morrison's testimony *would* assist the jury in converting damages in the future to damages in the present—the second question for the jury—once the future amounts have been quantified in the jury's deliberations. The operative question is whether Mr. Morrison should be permitted to testify, given the narrow usefulness of his testimony. This question is made more difficult by the fact that Mr. Morrison's expert report is not limited to explaining how a future value should be converted to a value in the present; Mr. Morrison also estimated the Defendant's damages in this case, but he did so by assuming that the jury would resolve uncertainty in the Defendant's favor.

By way of example, on page six of Mr. Morrison's supplemental expert report, Mr. Morrison sets forth the following tabulation of the Defendant's damages:

**SUPPLEMENTAL MORRISON REPORT**
**Garrett Myron Jones**
**Lost Back Base Salary, Benefits, Bonuses, and Incentive Awards**
**November 12, 2019 through December 31, 2021\*\***
   *\*\*Proxy date for trial: trial not yet scheduled*

|  | Lost Back Pay | Statutory Interest | Total |
|---|---|---|---|
| Base salary (net of offset from Linder base salary) | $ 594,657 | $ 29,409 | $ 624,066 |
| Benefits | 38,845 | 2,886 | 41,731 |
| Incentive award | | | |
| Assuming would not have been earned for 2019 and 2020 | 75,000 | 6,012 | 81,012 |
| Subtotal | 708,502 | 38,307 | 746,809 |
| Performance bonus (net of offset from Linder bonus) | | | |
| Assuming would have been earned for 2019, 2020, and 2021 | 560,000 | 28,764 | 588,764 |
| Total | $ 1,268,502 | $ 67,071 | $ 1,335,573 |

*NOTE: All amounts are net of Linder base compensation and bonues offsets*

DE 184-3 8.  Under the column "Lost Back Pay," Mr. Morrison includes an award of $560,000 for bonuses that the Defendant would have received from the Plaintiff, had the Defendant not been terminated. DE 184-4 at 96.  Those bonuses, however, were discretionary. *Id.* at 94-95.  There is therefore risk and uncertainty that the bonuses would not have been paid to the Defendant, which Mr. Morrison concedes:

> Q. But your analysis does not account for the uncertainty in the discretionary bonuses from Cutlass, right?
>
> A. That is correct.

*Id.* at 97.  Mr. Morrison's calculations assume that the jury would find Mr. Morrison would have received those bonuses—he assumes that the jury will resolve all uncertainty in favor of the Defendant:

> Q. And so the numbers that appear on this table don't reflect any accounting of risk or uncertainty, right?
>
> A. I did not -- as I've testified multiple times, I have not -- I did not adjust the cash flow to account for any of the additional risks we've been speaking of.

Q. Instead, you treated each figure as if it were absolutely guaranteed to occur, right?

MR. O'MALLEY: Object to the form.

THE WITNESS: I guess -- I guess that would be true.

*Id.* at 98.[3]

To be sure, an expert may estimate an amount of damages that a party has incurred—an expert is permitted to testify on an ultimate issue of fact. *E.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).  To do so, however, an expert must explain his or her reasoning, and the expert must provide support for any assumptions utilized as part of that reasoning. *E.g., Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1333 (S.D. Fla. 2012).  "Florida federal courts permit expert opinion testimony on damages even though the opinions are based on assumptions if there is a factual foundation for the assumptions," *McSwain v. World Fuel Servs. Corp.*, No. 1:20-CV-21203, 2021 WL 2682269, at *4 (S.D. Fla. June 30, 2021), but without support for an assumption, the assumption becomes a "leap of faith" prohibited by *Daubert v. Merrell Dow Pharmaceuticals*. *Winn-Dixie*, 862 F. Supp. 2d at 1333.

Here, Mr. Morrison failed to provide any support for his assumptions.  For example, Mr. Morrison does not explain why he could assume that the Defendant, an "at-will" employee, would remain employed until his chosen retirement age given the inherent riskiness of a new mining operation and the related financial challenges in a startup company:

Q. When you performed your analysis, Mr. Morrison, did you account for any risks inherit in Cutlass's business?

A. No.

---

3 Mr. Morrison did provide an alternative calculation for the scenario where the Defendant was not entitled to performance-based bonuses, however, those calculations are still premised upon unexplained assumptions as explained below.

DE 184-2 at 29.  This is no trivial matter:

> Q. Do you know when Cutlass was founded?
>
> A. It was either '14, 2014, I think, but 2019 is when they started on the Coalspur project.
>
> Q. Okay. Would you characterize it as a young business?
>
> A. Yes.
>
> Q. In general, young companies are riskier than more established ones, right?
>
> A. I agree.
>
> . . .
>
> Q. Okay. So Cutlass – I'll represent to you Cutlass was creating a mine from a greenfield, essentially, from the very beginning, nothing was there. It was constructing a mine, okay.
>
> A. All right.
>
> Q. Does that strike you as a risky endeavor?
>
> A. Yes.
>
> Q. Did you do anything to assess the riskiness of Cutlass's operation?
>
> A. No.

DE 184-4 at 31-32.  The Defendant was aware at the time he began his employment that he could be subject to termination prior to his desired retirement age.  The Defendant testified that his "biggest concern" at the time he accepted employment was that "he didn't want to be unemployed in a year or two," and, for this reason, the Defendant attempted to obtain a promise from the Plaintiff that he would not be terminated for a specified period of time. DE 68-1 at 23.[4] Furthermore, according to the Plaintiff, the Plaintiff encountered serious financial difficulties

---

4 Broadly summarized, it was the Court's ruling at summary judgment that any such promise by the Plaintiff was unenforceable as a matter of law. DE 102.

subsequent to the Defendant's employment, DE 64 at 6-7, and the Plaintiff has represented to this

Court that it may soon go out of business. DE 110 at 11.  Additionally, Mr. Morrison did not

explain why the Defendant's length of employment could be assumed, given the inherent riskiness

of the mining industry as a whole:

> Q. Okay. Did you account for any risks to the coal mining industry in your assessment?
>
> A. No.
>
> . . .
>
> Q. How do coal companies compare, in terms of riskiness, to other types of businesses?
>
> A. They're generally riskier than the market as a whole.

DE 184-2 at 30; 184-4 at 34.  Additionally, Mr. Morrison does not explain the assumption that the

Defendant would be physically able to work until his desired retirement age:

> Q. Okay. Additionally, with respect to each element of compensation, other risks would include the risk that defendant might die before 2025, correct?
>
> A. That's a possibility, yes.
>
> Q. Did you account for that possibility in your analysis?
>
> A. No.
>
> Q. Did you account for the possibility that the defendant might become incapacitated before 2025?
>
> A. No.

DE 184-2 at 70.  In short, Mr. Morrison's assumptions—unaccompanied by justification or

explanation—permeate the entirety of Mr. Morrison's damage calculations.

A district court may evaluate whether an expert's opinion "has been contrived to reach a

particular result," *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005), and by

characterizing an assumption of uncertainty resolved in the Defendant's favor as a decision for the jury, *combined* with Mr. Morrison's usage of the lowest possible discount rate permitted by courts of law, Mr. Morrison's damage calculations have been contrived to reach a particular result—the maximum possible damages that could be computed in this case. *See also Hipp v. Liberty Nat. Life Ins. Co.*, 39 F. Supp. 2d 1359, 1361 (M.D. Fla. 1999) ("[T]he failure to adjust for the risk inherent in that occupation renders an estimate of front pages damages 'unsound.'").  For all of the foregoing reasons, the Court will not permit Mr. Morrison to testify on the case-specific damage calculations in his report.  The Court next turns to admissible expert opinions of Mr. Morrison.

Based upon the Court's review of the parties' expert reports, the Court can ascertain two different methodologies the jury could use to quantify the Defendant's damages.  The jury could, as Mr. Morrison supposes, quantify the Defendant's lost income in the future and then, using Mr. Morrison's low, "risk-free" discount rate, convert that future lost income into a present figure.  In this method, the jury would account for uncertainty not through a higher discount rate, but rather through the reduction (or lack thereof) of predicted future lost earnings.  Alternatively, the jury could use larger, possibly unreduced amounts of lost earnings in the future (such as accepting the maximum possible damages proffered by the Defendant) and then apply a large discount rate to convert those future damages into a present value.  In this method, the jury would account for uncertainty not through the reduction of estimated lost future earnings, but rather through a larger discount rate, and this is the method endorsed by the Defendant's expert, Mr. Joseph Egan.

Pursuant to Rule 403 of the Federal Rules of Evidence, this Court should exclude relevant evidence if the evidence could confuse the issues or confuse the jury.  If the two different methodologies outlined above are presented to the jury, there is a real possibility of juror

confusion.  For example, the jury might think that it may utilize a high, unreduced amount of future earnings (to account for low or no risk and uncertainty) and then apply a low discount rate (to account for low or no risk and uncertainty), and thereby overestimate the Defendant's damages. Alternatively, the jury might think that it may reduce its estimate of lost earnings in the future (to account for great risk and uncertainty) and then apply a high discount rate (to again account for great risk and uncertainty), and thereby understate the Defendant's damages.

The Eleventh Circuit pattern jury instruction uses general language to instruct the jury on the quantification of damages that flow from an age discrimination claim: "When considering the issue of the [employee's] compensatory damages, you should determine what amount, if any, has been proven by [the employee] as damages as a result of [the employee's termination,] no more and no less."  The pattern verdict form is similarly general: "That [the employee] should be awarded damages? If your answer is yes, in what amount?"  The pattern jury instruction will therefore do nothing to dispel juror confusion regarding the methodology the jury must use, consistent with cases such as *Jones*, to quantify the damages flowing from lost wages, bonuses, and benefits.  The potential for juror confusion and the lack of guidance in the pattern jury instruction is the precise reason the Court previously suggested to the parties that they craft a mutually agreed upon jury instruction wherein the jury is clear as to its role, and clear as to how damages in this case should be calculated.  As the parties appear to have failed to reach an agreement on this issue, the Court's suggestion is now an order.

The Court can see no basis to prohibit Mr. Morrison from testifying about a discount rate in the general sense, together with how a discount rate computation is performed.  If the Defendant wishes to elicit an opinion from Mr. Morrison that a low, "risk-free" discount rate should be used

10

in this case, however, the Defendant must satisfy the Court's concerns about the potential for juror confusion.   The Court is concerned that Mr. Morrison's opinion is premised upon a *legal* assumption: the assumption that the jury will know that they are to factor all risk and uncertainty into their estimation of lost earnings in the future (the first question for the jury)—and not through the selection of an appropriate discount rate (the second question for the jury).  Unless the jury is clear that they are to consider risk and uncertainty *only* in the first phase of their damage calculations (and not the second), Mr. Morrison's legal assumption may render his testimony confusing and inadmissible under the Federal Rules of Evidence.

The Court leaves it to the Defendant's discretion to determine whether a jury instruction could be used to dispel this potential for confusion, whether Mr. Morrison himself, through his testimony, could dispel this confusion, or whether some other avenue could be used.  Regardless of the Defendant's elected method, the Defendant must proffer this method to the Court prior to the testimony of Mr. Morrison so the Court can decide whether to permit testimony from Mr. Morrison on the subject of an appropriate discount rate in this case.  What the Court will not permit is for Mr. Morrison to *estimate* the Defendant's damages.  Such an estimation would be premised upon unexplained assumptions prohibited by *Daubert*, would be an advisory opinion on how the jury should rule prohibited by the Federal Rules of Evidence, or would be testimony that would lead to jury confusion that is also prohibited by the Federal Rules of Evidence.  To the extent Mr. Morrison needs to demonstrate to the jury how, mathematically, a discount rate computation is performed, he does not *need* to do so using an example sourced in the Defendant's alleged damages—he may demonstrate such calculations using abstract examples free from the potential

11

for juror confusion.  The jury would then be free to apply the instruction it received from Mr. Morrison to the evidence in this case.

The Court addresses one final matter.  Although the Court previously denied the Plaintiff's Motion to exclude the testimony of Mr. Morrison (with the suggestion that the parties negotiate a jury instruction to resolve the issue), the Court construes the parties' Notice of Remaining Issues that Require Adjudication as an intent by the Plaintiff to renew its prior motion to exclude the testimony of Mr. Morrison.  Therefore, the Court partially vacates its prior order denying Plaintiff's motion in limine and substitutes this Order in its place to the extent of any conflict between the prior order and the instant Order.[5]  The Court also recognizes that it previously informed the parties that, should any disputes remain on the admissibility of expert testimony in the final weeks before trial, the Court would hold a hearing and entertain argument on the dispute. Unfortunately, the Court's trial calendar congestion in the aftermath of the Omicron Covid-19 variant will not permit the Court to hold such a hearing.  In the interest of streamlining trial to the maximum possible extent, the Court has entered this Order without the benefit of oral argument. Nonetheless, the Court's order is without prejudice insofar as should any party wish to dispute the Court's conclusions in this Order, the party may do so at trial.  The Court may, however, incorporate its reasoning in this Order as part of any denial of such a motion.

For the foregoing reasons, it is **ORDERED** that:

1. Mr. Morrison may testify as to what a discount rate is, generally, and how a discount rate is applied to a future dollar amount, in the abstract.

2. Mr. Morrison may not testify about a "risk free" discount rate or what discount rate is appropriate in this case until the Court is satisfied that the testimony will not mislead or confuse the jury, consistent with this Order.

---

5 Compared to the record before the Court at the time of the motion in limine, the Court is in a better position to rule on these matters in the present as it has now reviewed the experts' depositions and the experts' supplemental reports.

3. Mr. Morrison may not testify as to any case-specific damages calculations or estimations.

4. The testimony of Mr. Egan, the Plaintiff's rebuttal expert to Mr. Morrison, will necessarily be constrained by the testimony that the Court ultimately permits at trial by Mr. Morrison.

5. At such time as the parties' proposed jury instructions are due, the parties shall inform the Court of the method they propose to use to dispel any juror confusion regarding Mr. Morrison's testimony, consistent with this Order.  If any party elects to dispel this confusion through an avenue other than a jury instruction, that party will inform the Court as to the method the party intends to use at the same time the proposed jury instructions are filed with the Court.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 15th day of

February, 2022.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record

13